2-16-09 to exclude the people of the state of Illinois from taking action against Casey O. Askew, defendant of Askew. Agreeing will be given to the defendant, Mr. Askew, or agreeing will be given to the plaintiff and the defendant, Mr. Askew. Mr. DeBoer. Please speak loudly so that your arguments can be heard when they're recorded. Pay attention to the time signal. If you need additional time, you can request it. Maybe direct the microphone down a little bit towards your face. Okay, there. That's good. That'll work. Good morning, Your Honors. And please, the Court, Counsel. Your Honor, I'm going to start with the forfeiture issue in this case. Because for the first time on appeal, the state has brought up the lack of standing, alleged lack of standing. And I think what we've learned from numerous cases, and the case I was here on a year ago, Allard, where this Court decided that the state waived its good faith argument, the state can and does waive arguments. Now, it is true, as the state points out, this is discretionary. Your Honors could say we want to address it. However, there should be a good reason for it, and the state has not proffered any. Regarding the substance of that claim, does Mr. Askew have a reasonable expectation of privacy? I think a few key facts have to be looked at. One is he had fee to that apartment. Two, he was a recent overnight guest. It didn't specify what recent means. Well, you did know Mr. Blair for five years, correct? Correct, yes. So what's recent when it's five years could have been? Was there testimony, actually, that it was recent? That's the testimony I actually went back and looked again today, and the most I could get was recent. He had been an overnight guest. He has been an overnight guest in the past. He had been a, quote, unquote, recent overnight guest. Neither side, as far as I can tell, clarified what that means. Well, but there were no personal effects of his there. Correct. There were no personal effects, but he had a key. He had a key, exactly. And I think all of those circumstances, being an invited guest, et cetera, and being present legitimately on the scene at the time, unlike the Ninth Circuit case cited by the state where the daughter or son, I forgot which one it was, the child was not even present at the scene at the time. Now, let's go to the substance of the Fourth Amendment claim, whether it was consent or not. Again, I think it's a very simple legal proposition to say that we don't – I agree with the state. We don't look at it from the perspective of the consentor. We look at it from the perspective of a reasonable officer. And I will say these extremely honest police officers, I believe every word that they said, just like the – because they were – I mean, it would have been very easy for them to say, you know, he didn't give me – he gave me consent. And I walked in. He said, open the door and said, come on in. He said, yeah. Walked away to get his bread out of the oven. But the key fact, the key fact is the officers knew and they admitted, they were honest. They knew that when he said, come on in, he had his back towards them. So he didn't give permission for those particular police officers to come in. The issue should be whether or not the police believe they had authority for them to come in. Well, but didn't he – one could look at it as he gave permission to anyone or those people who had knocked on the door to come in, regardless of whether they were police officers. I guess my analogy to this, and I didn't see this in any case law, would be if you have an open door. Let's just say there's an open door in a house. And the police officers walk in and say, oh, it's an open door. I see people walking in. Someone walks right in with them. That's not what happened. He said, come in. But the analogy would be it has to be – pretend in my analogy that another person comes in. So they think, oh, everyone's invited in. It's a party. Everyone's in. That's not the issue. The issue is whether or not they believe that they have the authority for the police to come in. And I don't think that's too high of a standard to say. Did a reasonably prudent police officer believe that he or she, as a police officer, had the authority to come in? Let's assume that they had consent to enter. Did that give them the right to search the couch? If your client had standing, don't they need a warrant? To search. Well, this certainly wasn't argued. Well, I'm looking at it, but if I were the lawyer and court found that there had been a consensual entry and your client has Fourth Amendment rights because he does have a key, he has an expectation of privacy, he is allowed to come and go to that apartment as he pleases, even if the police saw him hide the drugs in the couch, wouldn't they still need a warrant? Honestly, no. Why not? Well, because then you have direct observation of potential criminal activity, and if you get a warrant, it's going to be destroyed. How do we know it's criminal activity? Well, because I think the testimony was that there was drugs out on the table. There was a baggie with some substance in it. Exactly. Did they know 100% that was drugs? No, but I think honestly they wouldn't have to get a warrant for that. And this was more than a momentary possession of those drugs, enough time at least for them to be picked up, held, and then hidden or an attempt to hide them in the couch. So this is more than momentary and really would indicate exclusive control. Well, I guess that goes into my next argument, a reasonable doubt, but I would respectfully disagree with that proposition. I think what the case law talks about is not just whether or not you touched the drugs. I mean, certainly he touched the drugs. He grabbed them. In that sense, yes, he possessed them. But it has a legal meaning with the intent to exercise exclusive control over it. So if he is basically hiding it on behalf of someone else, I would contend that is not exclusive possession. That is, it could be some sort of obstruction charge. I'm not saying that it's advisable, but I don't see how he suddenly becomes the possessor because he decides to hide it on behalf of his friend. And obviously the issue there also would be he took the fifth of the masks if those were his drugs. Well, there are dozens of cases involving joint possession. Sure. So he's possessing it with the intent to conceal it from the police on behalf of the owner of the substance, Mr. Blair. Well, the joint possession cases, 99% of them are, and I think there was one case cited by the state, is we're in a car, we both have those drugs, we both plan on using them, we both plan on selling them, whatever. We both have them. I think in the unique circumstances of this case, I don't think anyone could say that he intended on possessing those drugs other than putting them into the couch. Other than to obstruct justice by hiding them. And that would be a good obstruction of justice charge, but not a good possession charge. Okay. So if there's any more questions, I'd be happy to answer them. Otherwise, I'll reserve time. Yes. Thank you. Thank you. Good morning, Your Honor. This is the counsel. May it please the Court. Briefly, in terms of the expectation of privacy, it is the defendant's burden to demonstrate that he had an expectation of privacy. And looking at the factors, it's close. It's a very close case because he did have a key. But it was a key that was given to him with no – that there was no evidence that he had ever used it in any manner. As Myron Blair, the owner who gave him the key, said, I gave it to him and he can use it anytime he's ready. In terms of how recent he had been here, counsel may have a cite to the record, which I did not see, but I didn't see any testimony that said it was recent that he had stayed as an overnight guest. So what we have is that he had stayed there, according to Myron Blair, a couple of times over that five years or however long he'd been there. It's pretty common in households to have friends or acquaintances and oftentimes even family members who will be given a key to use the home when you're not there or to come in to maybe check on a house. So if I, for example, hypothetically gave my daughter a key to my home and she invites other guests there and the police come to the door, she has no expectation of privacy in the home? Well, you have to look at all the factors, Your Honor. Well, I'm looking at this factor. Mr. Blair gave the defendant a key to the home for the defendant, Mr. Askew, to use as he pleased. Well, he asked as he pleased and he could come and go as he wanted to. But in this case, since we don't know from, you know, obviously again I'm going back to the burden here, but since we don't know how recent he's ever stayed here overnight, it's only been a couple of times. On this particular date, he was a social guest. He was either invited directly and then his girlfriend came or vice versa, I can't recall. I believe it was his girlfriend who was invited and he came as her guest. And then on top of that, he certainly didn't have any expectation of privacy in this particular area. He had the drugs out where they were seen by other people. So this isn't something where they were closeted away. Is there anything else in the house that would indicate he is there with some regularity? No. I believe there was in fact some testimony, again it would be by Myron Blair, that in fact he didn't have any possessions in the house. So there are several factors which show that he may not have had a reasonable expectation of privacy. And given that it is the defendant's burden, we would ask your audience to consider that if you determine that there is not consent. Consent, of course, is the ground on which this court, excuse me, the trial court, determined that the search did not violate his Fourth Amendment rights. And here we have a case where you have to look at what occurred and what was known to the officers. They didn't know there was a party going on. And they had been told that there was traffic coming in and out and that there might be drug traffic going on. That's what they came in. In reliance on that, they came to the door and they knocked. One of the officers, I think it was the first officer, Laura Coente, who said he was surprised or confused, I forget what his word was, but that the door was answered by Myron Blair, who owned or leased the apartment, and that he opened the door widely, said, come on in with his back to them as he then entered in and they followed along. The fact that he's confused or surprised by this means it's not your typical reaction. Obviously, most people who go to a door and answer to a knock, check out who's there. You know, and you come to the door facing the door in the first place. So it is unusual in that sense. It's not typical, maybe, maybe not average. But that doesn't mean that he doesn't have a reasonable objective, reasonable expectation or reasonable belief that he was given consent to enter. And the reason is he doesn't know what's going on in this person's mind, if there are other circumstances. And what the officers do know is that if you have nothing to hide, you might invite officers in. There's nothing to say that they had to even know that they were officers. He just opened his door and was obviously being very lackadaisical or very, you know, easygoing on this. He didn't have anything to hide is what would be the reasonable inference from that behavior. Well, then, of course, the issue or is the issue not what Mr. Blair thought, that it was the returning guests who had gone out to get the Kool-Aid, that he was already back. It's not necessarily what he thought, but what the officer's expectation or reasonable belief was. That's right. It's already the officers. So anything after that point in terms of, you know, what anybody suggests could be the reason that he answered it that way, whatever was in his mind, whether he would have done it again, you know, knowing what's happened once, would he do that again, you know, under similar circumstances. We don't know that. All we know is what the officers knew. And for all we know, Myron Blair really didn't even know that drugs were out in this, and that's why he thought he could afford to be so lackadaisical. Well, what he then did was when he saw the police, he actually left their presence in his apartment and went to take bread out of the oven. He didn't tell them to leave. Exactly. So if we're looking at it subjectively, we know that he, too, had that same sort of easygoing nonchalant, whatever type of manner you want to call that, he really didn't seem to care enough to even be there in the presence of the officers while they were then ordering guests to, you know, stand still and that type of thing. He went and checked on his bread. So this is what the officers saw also. So from their perspective, that's what they saw. Yes, exactly. So what we have is, and that's a pretty good indication that, you know, officers aren't expected to be mind readers. They're not expected to know one person who is that open and easygoing and, you know, and the thought is, of course, probably that there is no criminal activity going on. But on the other hand, they don't have to know that any more than if given a consent to search luggage or something, it's the same idea. It's the idea that once they've got a valid consent, they don't have to go behind that and say, well, now that we found drugs, he must not have meant it. Well, they didn't find the drugs immediately, correct? They walked into the living room, saw the defendant sitting there, and in front of him on the table was a baggie. I think it was the first officer, Lara Coente. He took the baggie and stuffed it into the couch, and at that point he was taken into custody. Right. I believe it was Lara Coente who either at the motion to suppress or at trial said that he suspected it was drugs, it was in the baggie. He saw the scale, the digital scale. He saw the scale after he had come to the crime court. Is that correct? I don't recall that. But he said that he saw the baggie of drugs, and then when told to stop, everyone was told to stop, everybody else did stop. Instead, he reached forward. It was something that was like a foot away from him, I think. Reached forward, grabbed it, started to stuff it in, told to stop again, did not stop, was actually hiding it. And hiding allows for an inference, first of all, of possession and intent to control. But obviously that also gave the officer a suspicion that this was criminal activity and that there were drugs in the baggie. Once the officers have gotten past the entryway, and I don't know exactly what this apartment looks like, but there was an entryway, they followed toward the living room. Now Officer Laracuente, I think is the one who testified, that everybody stopped talking and they were staring at him like deer in headlights. Does that change anything about the consent in the officer's mind? Not in the slightest because they've already gotten the consent and they're already in there in a position to then see what they see, which is the baggie on the table. So at that point it's really kind of moved as to what other people reacted. And plus it's their reaction to people who maybe did figure with drugs out that the owner would not be letting people in. But that doesn't mean that was Myron Blair's intent even from the start. And of course we're not really looking to what his intent was in terms of these officers. We're looking to what the officers knew at the time. And then very briefly I just wanted to address the third issue, which is the transitory nature according to the defense and whether that means that he didn't have exclusive and immediate control. Of course he did have immediate control. He had the drugs. He actually had actual possession as well as constructive possession ahead of time. And the actual possession he picked up the baggie, obviously, and then tried to hide it, leading to an inference of control right in that. And I think I cited a case for that. On top of that, this wasn't the transitory nature that you see in some cases where it's been determined that the defendant did not have control, where somebody unexpectedly throws a bag at him to, like, you know, get rid of it when they see the police officers, or in some way has possession themselves. I believe there was a case cited, I don't recall now the name of the case, but I believe it was a federal case cited by a defendant. And it involved federal agents who had possession of the drugs themselves because they were trying to do kind of a reverse buy. And with that, they had the possession. They were only allowing him to sort of touch the merchandise, and in two seconds or something they then arrested him. So, of course, he hadn't made any sort of action to show that he was, you know, intending to even take control of those, much less that he had control of it at that point. That's very distinguishable from what's going on here. The case is Kitchen. Kitchen, yes. What good reason do we have to overlook the state's forfeiture? I believe it's because of the burden. The burden is on the defendant, so we can still look at the record we have. Now, could it have been developed further? Possibly it could have, but on the facts we have, with it being the defendant's burden, is it enough to show the reasonable expectation of privacy? And so that's why I'm going to ask you to overlook the forfeiture, if need be. And for those reasons, we'd ask this Court to affirm the defendant's conviction sentence. Mr. DeBoer. Your Honors, regarding the forfeiture question, forfeiture excuses must be taken on a case-by-case basis. And why wasn't it raised in this case? If the answer is because it's the defendant's burden, that's in every single case. There's nothing unique to this case. So there has to be a reason unique to this case as to why forfeiture should not be granted or imposed upon it. Now, as far as there was questions, I believe I would respectfully disagree a little bit about what the testimony showed about once they were inside that the homeowner then went to look for his bread. Unless I may be misunderstanding the significance of that. My understanding is he went to look at his bread at the same time he had his back towards them. He said come in and he went to check the bread because he was worried it was burning in the oven. Exactly. I just want to make sure. It was not that he saw that they were officers and then said, oh, no big deal, I'm going to go get my bread. Counsel's point, the State's point is that was it objectively reasonable for the It's not what's in the homeowner's mind as to whether or not he's made a mistake. It's whether or not the police officers objectively believe, reasonably believe, that they had authority to enter that apartment. And I think that's a good fact for us because if you know there's a lot of traffic, if you know there's a party going on, if you know the person's distracted, then a reasonable officer would say that consent wasn't meant for me, that consent was meant for the guests. What's the officer to do then? Does he have to say, by the way, we're police officers? Yes. It's not too hard to say, police, can I enter? Police. I mean, that could have solved the whole problem. Instead, I think they're probably doing it to try to catch them in some sort of way. There's no reason that they couldn't have announced themselves as police. Of course, your problem is the trial court filing for the State on the issue of consent. But that's a legal issue. It's not a factual issue. The credibility of witnesses is manifest weight, and there was some discrepancies between Mr. Blair's testimony and the officer's, correct? Yes, but I'm relying 100 percent on the officer's testimony. I believe the officer. So you believe, taking all the evidence and the like, most favorable to the State, there still is not consent? Correct. Because a reasonable officer would know that that consent was not for him as a police officer. And then one correction to make is I did keep saying recently. I look back at my brief, and the word used was previously. It may not be recently. I apologize if that's – but I guess the record stands for itself what it was. Maybe it is vague on that point. But I also don't think that's necessarily dispositive, given the fact that a key and et cetera. Thank you. Thank you. We thank both parties for their arguments today. The case will be taken under advisement. A written decision will be made to enforce what stands for recess until the next case is called.